## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ROBERT A. DOANE,** | ) |
| | ) |
| **Plaintiff** | ) **Civil Action No.** |
| | ) |
| **v.** | ) |
| | ) |
| **PROVIDER POWER MASS, LLC.** | ) |
| **NEW WAVE POWER, LLC.** | ) |
| | ) |
| **Defendants** | ) |
| | ) |

## COMPLAINT
### (With Jury Demand Endorsed Hereon)

Now comes Plaintiff, **ROBERT A. DOANE**, by and through undersigned counsel, and for his Complaint against Defendants states and avers as follows:

## INTRODUCTION

This case involves a scheme by Defendants Provider Power Mass, LLC. ("Provider Power"), a licensed competitive energy supplier, and New Wave Power, LLC. ("New Wave"),a self-described "energy broker,"(collectively, "Defendants") to lure Massachusetts consumers into switching electricity providers through illegal telemarketing activities. Plaintiff, Robert A. Doane brings this complaint against Defendants  seeking actual, statutory, and punitive damages for knowing and willful violations of the Telephone Consumer Protection Act, 47 U.S.C. §227, et seq. ("TCPA"), the Massachusetts Telephone Solicitation Act, G.L. c. 159C, et seq. ("MTSA"), the Massachusetts Wiretap Act, G.L. c. 272 § 99 et seq. ("MWTA"), invasion of privacy and intrusion upon seclusion, and violations of the Massachusetts Consumer Protection Act, G.L. c. 93A, et seq. ("MCPA").

## PARTIES

1.      Plaintiff, Robert A. Doane ("Doane" or "Plaintiff"), is, and was at all relevant times, a citizen of Commonwealth of Massachusetts domiciled at 21 New Lane, West Tisbury, Massachusetts 01880.

2.      Defendant, Provider Power Mass, LLC.  is a Maine Limited Liability Company with its principal place of business located at 12140 Wickchester Lane Suite 100, Houston, Texas, 77079.  Provider Power is, and was at all relevant times, a competitive electric provider and a wholly-owned subsidary of Spark Energy, Inc.

3.      Defendant New Wave Power, LLC.  is a Texas Limited Liability Company with its principal place of business located at 12012 Wickchester Lane, Ste 680, Houston, Texas 77079. New Wave  is, and was at all relevant times, a self-described "energy broker" that provides marketing and telemarketing services to Provider Power.

4.      Whenever in this Complaint it is alleged that e Defendants committed any act or omission, it is meant that  Defendants' officers, directors, agents, servants, or employees, subsidiaries, or affiliates committed such act or omission and that at the time such act or omission was committed, it was done with the full authorization, ratification or approval of Defendant or was done in the routine normal course and scope of employment of the Defendant's officers, directors, agents, servants, or employees.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as this action involves violations of the TCPA. *Mims v. Arrow Fin. Servs., LLC*., 132 S. Ct. 740 (2012).  This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law causes of action.

6.     This Court has personal jurisdiction over Defendants because Defendants conduct significant business in this District and have continuous and systematic contacts with this District through their telemarketing efforts that specifically target consumers in this District.  Further wrongful conduct giving rise to this case occurred in, was directed to, and/or emanated from this District.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the wrongful conduct giving rise to this case occurred in, was directed to, and/or emanated from this district.

## FACTUAL ALLEGATIONS

### A.     Defendants' Telemarketing Activities

8.     Provider Power is a licensed competitive electric supplier ("CES") in Massachusetts.

9.     In deregulation states, like Massachusetts, CESs may compete to supply the energy services, but the local distribution companies continue to deliver power through their wires regardless of which company supplies them.

10.     CESs, like Provider Power, play a middleman role: they purchase power directly or indirectly from generation companies and sell that electricity to end-user consumers.  However, CESs do not deliver that electricity to consumers.  Rather, generation companies deliver the electricity to distribution companies, which in turn deliver the electricity to the ultimate consumer.  CESs buy electricity at the wholesale rate, then sell that power to end-users with a mark-up. Thus, CESs are essentially brokers and traders.  They neither make nor deliver electricity, but merely buy electricity from the generation companies and re-sell it to end-users.

11.     Massachusetts Attorney General Maura Healey has expressed serious concerns about the improper practices of CESs, like Provider Power, who operate in the Commonwealth of Massachusetts.  In March 2018, Attorney General Healey issued a report calling for an end to the

competitive electricity supply market for individual residential customers in Massachusetts.
According to the report, "Massachusetts electric customers who switched to a competitive
electric supplier paid $176.8 million more than if they had stayed with their utility company
during the two-year period from July 2015 to June 2017."  Healey implicitly recognized the false
promises made by CESs: "Competitive electric suppliers promise big energy savings but are
actually burdening customers with hundreds of dollars in extra costs."

12.      A Massachusetts customer cannot be switched to a competitive supplier without the
customer's consent ("Affirmative Choice").  Unauthorized switching of energy suppliers - also
known as "slamming" - is illegal.  Affirmative Choice may be evidenced by: (1) a customer's
signed letter of authorization; (2) third-party verification; or (3) the completion of a toll-free call
made by the consumer to an independent third party operating in a location physically separate
from the telemarketing representative who has obtained the consumer's initial oral authorization
to change to a new competitive supplier.  M.G.L. c. 164, § 1F(8)(a); 220 CMR 11.05(4)(c).

13.      As a CES, Provider Power only generates revenue in deregulated markets in the event
that a residential consumer is "switched" from the consumer's present energy provider and is
enrolled with Provider Power.   In order to assist Provider Power obtaining new customers in this
matter, Provider Power contracted with New Wave and worked in concert with New Wave to
develop and implement a marketing strategy specifically targeting Massachusetts consumers.

14.      At all relevant times, as part of their jointly devised marketing plan and in order to
attempt to enroll new residential customers, Defendants utilized agent domestic and overseas
telemarketers (the "Telemarketers") to repeatedly, harassingly, deceptively and illegally place
hundreds of thousands of calls to Massachusetts consumers utilizing  prerecorded messages,

caller-ID spoofing (a process that displaces the actual caller identification with a fake caller identification) and automatic telephone dialing systems ("ATDS").

15.     At no point have the Telemarketers been registered with the Massachusetts Office of Consumer Affairs and Business Regulations as required by 201 C.M.R. § 12.04.

16.     At all times relevant, including but not limited to April, 2019, Defendants exercised direct control over the Telemarketers' actions on their behalf.  For example:

    a.      Defendants limited the type of consumers the Telemarketers could solicit.

    b.      Defendants restricted the geographical area within which the Telemarketers could solicit business.

    c.      Defendants provided specific scripts and sales pitches for the Telemarketers, including false and misleading details about Provider Power's "programs" and alleged "discounts"[1] and instructed the Telemarketers to falsely represent that they were affiliated with the consumers' current electricity providers.

    d.      Defendants instructed the Telemarketers as to what personal information to obtain from consumers.

    e.      Defendants instructed the Telemarketers with respect to the volume of telemarketing calls and the methods to be utilized.

    f.      Defendants instructed the Telemarketers to record Massachusetts consumers without their knowledge or assent in violation of the MWTA.

    g.      Defendants had day-to-day control over the Telemarketers' actions, including the ability to prohibit the Telemarketers from using an ATDS, illegal spoofing and other illegal methods to contact potential customers.

---

[1] In reality these discounts were nonexistent.

17.     Although Defendants either knew or should have known of the provisions of the TCPA, MWTA and MTSA, Defendants, at all relevant times, directed their Telemarketers to generate leads by using methods that violate the substantive provisions of the TCPA, MWTA and MTSA.

18.     The calls placed to Plaintiff complained of herein were within the scope of the Telemarketers' job duties and the actual or apparent authority the Defendants provided to the Telemarketers.

19.     At all relevant times, Defendants directly profited from the Telemarketers' aforementioned efforts and ratified the actions of the Telemarketers by knowingly accepting the benefits of the Telemarketers' illegal activities.

### B.     Illegal and Harassing Calls to Plaintiff

20.     Plaintiff is an individual who suffers from chronic pain and a sleep disorder, and often sleeps during the day.  Plaintiff is also the trustee of several trusts, and at the time of the calls complained of was the primary caretaker and power of attorney for his two elderly parents, and stepmother suffering from dementia.  In these capacities, Plaintiff was required to keep his cellphone on his person at all times so he could attend to the needs of the trusts and direct the care of his family members.

21.     At all times relevant, Plaintiff's cell phone number, XXX-XXX-6577 ("Cell Phone")—which has been his home number since childhood—has been registered to a "do not call list" maintained by the Federal Trade Commission ("FTC") and the Massachusetts Do Not Call registry as Plaintiff does not wish to be disturbed and harassed by telemarketers.

22.     Plaintiff's family and friends associate Plaintiff with his Cell Phone and Plaintiff's elderly parents, who were able to easily remember this number, relied on it during the relevant time period to contact Plaintiff on daily basis.

23.    In the weeks leading up to April 6, 2019, Plaintiff received, without his prior express written consent, not less than twenty (20) telephone calls ("Unsolicited Calls") to his Cell Phone, using prerecorded messages, caller-ID "spoofing" and an ATDS, from the Telemarketers attempting to convince Plaintiff to switch his electricity provider to Provider Power.

24.    When Plaintiff would receive the Unsolicited Calls, in each instance, the prerecorded messages stated that the call was pertaining to a notice allegedly received regarding a rate reduction on the electric bill, and without an option to opt out, to press 0 to speak to a representative.

25.    In order to attempt to get the Unsolicited Calls to cease, at first, Plaintiff pressed one and then spoke to an agent and requested not to be contacted further.  This was, however, ineffective as the Unsolicited Calls continued unabated thererafter.

26.    When Plaintiff would request the Telemarketers' do-not-all policy, the Telemarketers would hang up, and the calls would then continue.

27.    Plaintiff's attempts to return the Unsolicited Calls revealed the numbers were non-working and thus spoofed, and in fact, many of the Unsolicited Calls appeared on the caller identification with one digit missing.  For example, two calls with the same prerecorded message on April 1, 2019, occurring at 1:17 PM and 1:59 PM, appeared on the caller identification as "+1 (781) 241- 402" and "+1 (781) 247-426" respectively.

28.    At no time during any of the Unsolicited Calls was it disclosed that the call was being recorded, nor was Plaintiff aware the calls were being recorded.

29.    Despite Plaintiff's requests that the calls stop, the Telemarketers continued to call incessantly, often waking Plaintiff from his sleep, disrupting his concentration, causing him to lose focus on his daily tasks and causing him aggravation and annoyance.

30.     In order to identify those responsible and to try to get the calls to stop, Plaintiff was

compelled to feign interest in what was being offered.   Accordingly, on April 6, 2019, at 2:07 PM,

when an Unsolicited Call was received from a number appearing on the caller identification as

"+1 (781) 244-129" Plaintiff answered and attempted to gather information.   Upon answering,

and hearing the above-described prerecorded message  and  pressing one, an agent came on the

line, essentially repeated the statements in the prerecorded message and  attempted to convince

Plaintiff to switch his electricity provider by offering steep "discounts" on his residential electric

bill from the amounts charged by Plaintiff's electricity provider (Eversource).

31.     During the course of the April 6, 2019 Unsolicited Call, the agent, who identified himself as

"John," explained that Plaintiff was approved for a program that "Eversource has just designed

to provide a low-income person like [Plaintiff] with power services in Massachusetts".   John

identified this program as "Provider Power Mass."  John then claimed they would also be

sending a "$100 gift card to [Plaintiff's] doorstep in 3-5 business days for shopping."  Plaintiff

then asked John whether Provider Power Mass could be called back at the number appearing on

Plaintiff's caller identification.  John replied "exactly," and then claimed he would also provide

Plaintiff an additional callback number.

32.     As the April 6, 2019 Unsolicited Call progressed, John next informed Plaintiff that the

last part of the process was a "verification" required by Eversource and Massachusetts to "be

sure the discounts are going to the right person."  John informed Plaintiff that Plaintiff's name

key for this program was "DOAN" and explained that a "verification agent" would go over the

cancellation fee and the right to cancel within one month.   Although this right to cancel existed,

John explained, however, that he has not heard of anyone in Massachusetts ever canceling.

John further explained that the verification agent would provide a confirmation number

regarding the discounts and John instructed Plaintiff that it was necessary to provide a "clear yes" to each of the verification agent's questions.

33.     John then put Plaintiff on hold and a moment later the so-called "verification agent" came on the line and identified himself as "Tony." Tony verified much of the information that John collected. Tony then stated that Plaintiff was "enrolling in the-12 month saver plan," and that materials would be received in the mail. Tony further stated that there would be three days to cancel and go back to Eversource. Plaintiff was instructed to call 888-386-4080 to cancel. This was the first indication that Plaintiff received that this was not an Eversource program, as John had falsely represented. Tony stated that if Plaintiff cancelled, there would be a $100 termination fee, and requested that Provider Power be authorized to contact and get usage information from Eversource.

34.     As the call with Tony continued, Plaintiff next asked Tony if Provider Power could be reached on the number appearing on Plaintiff's caller identification. Plaintiff then heard a swish sound which appeared to indicate that Tony had stopped the recording. Following the swish sound, Tony informed Plaintiff that Provider Power could not in fact be reached on the number appearing on Plaintiff's caller identification and instructed Plaintiff to "call Provider Power Mass Customer Service" at "866-573-2674" with any concerns. After asking a few more questions, Tony stated verification was complete, and provided Plaintiff with verification number 786938.

35.     Following the conversation with Tony, Plaintiff determined that the number that Tony provided belonged to Provider Power.

36.     After the Unsolicited Call on April 6, 2019 was terminated, the initial agent, John, called back a few minutes later from a number appearing on the caller identification as "+1 (781) 241-417." The line had a poor connection, and the call was terminated. John called again a few

minutes later from "+1 (781) 248-356," and yet again a few minutes after that, from "+1 (781) 243-989."

37.     Determining that Provider Power was responsible for the Unsolicited Calls, Plaintiff sent Provider Power and its officers a demand letter pursuant to M.G.L. c. 93A (" First Demand Letter") on April 7, 2019 via email and facsimile demanding their do-not-call policy, the name of the agents operating on Provider Power's behalf, if any, and demanding that the harassing calls immediately stop.  The First Demand Letter also demanded actual and statutory damages.

38.     Provider Power's Regulatory Manager Martha Lopez ("Lopez") acknowledged receipt of the First Demand Letter by email.

39.     Despite receipt of the First Demand Letter, the Unsolicited Calls from spoofed numbers continued unabated.  Specifically, Defendants' agent Telemarketers called Plaintiff again on April 8, 2019 at 2:43 PM from "+1 (781) 249-425", on April 9, 2019 at 1:26 PM from "+1 (781)248-250" and on April 12, 2019 at 5:50 PM from "(781)-875-6461".  Upon answering each of these Unsolicited Calls, Plaintiff heard the same prerecorded message identified above.

40.     As the Unsolicited Calls continued, following Plaintiff's demand that they cease, Plaintiff sent Provider Power a second demand letter ("Second Demand Letter") on April 15, 2019 by email and facsimile describing the additional Unsolicited Calls that Plaintiff had received, demanding the identity of all persons responsible for the Unsolicited Calls and once again demanding that the Unsolicited Calls stop.

41.     In response to Plaintiff's Second Demand Letter, Lopez indicated by email of April 16, 2019 that Provider Power's "vendor," New Wave, was responsible for the Unsolicited Calls.

42.     On April 16, 2019, Plaintiff sent New Wave and its principal George Scott Cofran ("Cofran") a demand letter pursuant to M.G.L. c. 93A ("New Wave Demand") by email in connection with the

Unsolicited Calls. The New Wave Demand, demanded New Wave's do-not-call policy, demanded that the harassing calls immediately stop and likewise demanded actual and statutory damages.

43.    Astonishingly, although Provider Power received both the First and Second Demand Letters, and New Wave received the  New Wave Demand, Plaintiff again received Unsolicited Calls from Defendants' agent Telemarketers on April 17, 2019 at 2:33 PM from "+1 (781) 245-921", on April 17, 2019 at 7:07 PM from "+1 (781) 246-896", and on April 18, 2019 at 2:07 PM from "+1 (781) 245-047".  Like the previous Unsolicited Calls, each of these Unsolicited Calls was from a spoofed number utilizing an ATDS and played the same prerecorded message described above.

44.    As Provider Power had done nothing to stop the Unsolicited Calls, Plaintiff sent Provider Power a third demand letter ("Third Demand Letter") on April 19, 2019 describing the Unsolicited Calls on April 17th and 18th, demanding statutory damages and once against demanding that Unsolicited Calls cease.

45.    Following the Third Demand Letter and several requests, Cofran disclosed by email on April 23, 2019 that certain of the Unsolicited Calls[2] were made by New Wave's call center "Trisero" located in Punjab, Pakistan.

46.    As a direct and proximate result of Defendant's aforementioned illegal telemarketing activities, Plaintiff has suffered actual harm, including but not limited to, invasion of privacy, loss of concentration, loss of productivity, loss of sleep, annoyance, aggravation, emotional distress, diminished value and utility of his cell phone and subscription services, wear and tear to his cell phone, the loss of battery charge and battery life, and per-kilowatt electricity cost required to recharge his cellular telephone as a result of increased usage of his cell phone services.

---

[2] Cofran admitted that three of the Unsolicited Calls were made by Trisero.

47.     In addition to the foregoing, as a direct and proximate result of Defendant's aforementioned illegal telemarketing activities, Plaintiff was forced to identify those responsible to try and get the illegal activities to cease, and in the process of doing so incurred expense in time, materials, and use of equipment.

48.     Despite receiving Plaintiff's Demand Letters, Defendants failed to respond with a reasonable settlement offer.  Defendants likewise failed to provide a copy of their do-not-call policies as required by the TCPA.

## COUNT I
### (Violations of the Telephone Consumer Protection Act, 47 U.S.C. §227(b)(1)(A))

49.     The allegations of paragraphs one (1) through forty-eight (48) of this Complaint are realleged and incorporated herein by reference.

50.     In 1991, Congress enacted the TCPA in response to a growing number of consumer complaints regarding certain telemarketing practices.

51.     The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

52.     The TCPA defines ATDS as "equipment which has the capacity…to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers." 47 U.S.C. §227(a)(1).

53.     According to findings of the Federal Communication Commission ("FCC"), the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

54.     The FCC requires prior express written consent for all autodialed or prerecorded telemarketing calls ("robocalls") to wireless numbers and residential lines. In *the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830, 1844 ¶ 33 (2012).

55.     The FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, CG Docket No. 92-90, Memorandum and Order, 10 F.C.C. Rcd. 12391, 12397 ¶ 13 (1995).

56.     The FCC confirmed this principle in 2013, when it explained that "a seller … may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 F.C.C. Rcd. 6574, 6574 (2013) ("May 2013 FCC Ruling").

57.     Defendants are legally responsible for ensuring  the Telemarketers' compliance with the TCPA even if Defendants did not make the calls themselves.

58.     Defendants, by and through their agent Telemarketers, violated 47 U.S.C. §227(b)(1)(A)(iii) by placing not less than thirty (30) telemarketing calls to Plaintiff's Cell Phone using an artificial or prerecorded voice and ATDS, without Plaintiff's prior express written consent.

59.     Pursuant to 47 U.S.C. § 227(b)(3)(B), Defendants are liable to Plaintiff for a minimum of $500 per violation, or not less than $15,000.00 for the not less than thirty (30) violations hereunder.

60.     Pursuant to 47 U.S.C. § 227(b)(3)(C), willful or knowing violations of the TCPA trigger treble damages.

61.     Defendants' conduct in violation of 47 U.S.C. §227(b)(1)(A)(iii) was willful and knowing.

62.     Plaintiff is entitled to have his single damages of $15,000.00, trebled to $45,000.00, for the aforesaid willful and knowing violations of the TCPA.

## COUNT II
**(Violations of the Telephone Consumer Protection Act, §227(c)(1) to (4))**

63.     The allegations of paragraphs one (1) through sixty-two (62) of this Complaint are realleged and incorporated by reference.

64.     A private right of action exists pursuant to 47 U.S.C. § 227(c)(5) for violations of the regulations promulgated pursuant to the TCPA for the protection of telephone subscriber privacy rights.

65.     47 C.F.R. § 64.1200(c) and (d) set forth certain procedures with which a telemarketer must comply prior to the initiation of a telemarketing call.

66.     Defendants did directly, and through their agent Telemarketers, violate C.F.R. § 64.1200 et seq. in the following respects:

        A.     By failing to ensure that Defendants and the Telemarketers maintained a do-not-call list in violation of 47 C.F.R. § 64.1200(d)(1);

        B.     By failing to provide Plaintiff, upon his demand, Defendants' and the Telemarketers' do-not-call policy in violation of 47 C.F.R. § 64.1200(d)(1);

        C.     By failing to ensure that Defendants' personnel and the personnel of the Telemarketers were informed and trained in the existence and use of the do-not-call list in violation of 47 C.F.R. § 64.1200(d)(2);

D.      By failing to provide to Plaintiff the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and the telephone number or address at which the person or entity may be contacted in violation of 47 C.F.R. § 64.1200(d)(4); and

E.      By engaging in and causing a pattern or practice of initiating telephone solicitations to Plaintiff's Cell Phone without Plaintiff's express written consent on at least thirty (30) occasions in violation of 47 U.S.C. § 64.1200(c)(2).

67.      Pursuant to 47 U.S.C.A. § 227(c)(5) and the regulations promulgated thereunder, Provider Power is liable to Plaintiff for a minimum of $500 per violation of the TCPA, or not less than $15,000.00 for the not less than thirty (30) violations hereof.

68.      Provider Power's aforesaid conduct in violation of 47 U.S.C.A. § 227(c)(5) and the regulation promulgated thereunder, was willful and knowing.

69.      Plaintiff is entitled under this count to have his single damages of $15,000.00, trebled to $45,000.00, for these willful and knowing violations.

### COUNT III
### Violations of the Massachusetts Telemarketing Solicitation Act, G.L. c. 159C

70.      The allegations of paragraphs one (1) through sixty-nine (69) of this Complaint are realleged and incorporated by reference.

71.      The Massachusetts Telephone Solicitations Act, M.G.L. c. 159C et seq., (the "MTSA") and the regulations promulgated under the authority of the MTSA impose strict pre-conditions, limitations and restrictions on unsolicited telephonic sales calls made to Massachusetts residents, and any such calls not in compliance with any of these pre-conditions, limitations and restrictions are prohibited.

72.     Telephone solicitors engaging in unsolicited telephone sales calls to Massachusetts consumers are required to "properly register on an annual basis" with the Massachusetts Office of Consumer Affairs and Business Regulations (the "OCABR"). 201 C.M.R. § 12.04.

73.     At all times relevant, including but not limited to April, 2019, neither Defendants nor the Telemarketers were registered with the OCABR, as required by 201 C.M.R. § 12.04.

74.     By failing to comply with the registration requirement, Defendants and their agent Telemarketers failed satisfy a basic, threshold requirement for conducting solicitations in Massachusetts and, thus violated the MTSA.

75.     Defendants directly and through their agent Telemarketers, violated the MTSA in connection with the calls complained-of herein in the following respects:

        a.      By making unsolicited sales calls to Plaintiff without prior express consent or permission in violation of M.G.L. c. 159C, § 1;

        b.      By calling Plaintiff after Plaintiff expressed his desire not to receive further calls, in violation of M.G.L. c. 159C, § 1;

        c.      By calling Plaintiff on his Cell Phone while he was registered with the Massachusetts Do Not Call registry in violation of M.G.L. c. 159C, § 3 and 201 C.M.R. § 12.02(1);

        d.      By making calls to Plaintiff without proper disclosure concerning the identity of the telemarketers and the ultimate seller in violation of M.G.L. c. 159C, § 5A and 201 C.M.R. § 12.02(7);

        e.      By failing to keep and consult the Massachusetts Do Not Call registry prior to calling Plaintiff in violation of 201 C.M.R., §§ 12.04(3) and 12.02(6); and

f.   By using falsified and displaced caller identification in connection with the Unsolicited Calls to Plaintiff in order to circumvent the use of caller identification services or devices in violation of M.G.L. c. 159C, § 4 and 201 C.M.R., § 12.02(5).

76.   The MTSA provides that "[a] person that receives more than 1 unsolicited telephonic sales call within a 12-month period by or on behalf of the same person or entity in violation of [c. 159C] may … bring an action to recover for actual monetary loss from such knowing violation or to receive not more than $5,000 in damages for such knowing violation, whichever is greater …"

77.   As a direct and proximate result of Provider Power's violations of the MTSA and the violations by the Telemarketers for which Provider Power is vicariously liable, Plaintiff has suffered actual damage as set forth in paragraphs forty-six (46) and forty-seven (47) above and other like and serious harm in an amount to be established at trial.

## COUNT IV
### Violations of the Massachusetts Wiretap Act, G.L. c. 272 § 99 et seq.

78.   The allegations of paragraphs one (1) through seventy-seven (77) of this Complaint are realleged and incorporated by reference.

79.   The MWTA, makes interception of wire and oral communications unlawful unless both parties consent to the recording. Moreover, it is unlawful to use such recording.

80.   For the purposes of the statute, the term "interception" means "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any interception devise by any person other than a person given prior authority by all parties to such communication…." G.L. c. 272, § 99(B)(4).

81.     An "interception device" means for the purposes of the statute, "any device or apparatus which is capable of transmitting, receiving, amplifying or recording a wire or oral communication.... G.L. c. 272, §99(B)(3).

82.     The MWTA provides that "any person who willfully commits an interception, attempts to commit an interception, or procures any other to commit an interception or to attempt to commit an interception of any wire or oral communications shall be fined not more than ten thousand dollars, or imprisoned in the state prison for more than five years."

83.     It is illegal under the MWTA to make use of the contents of an intercepted communication. See G.L. c. 272, § 99(3)(a), which provides that any person who "willfully uses or attempts to use the contents of any wire or oral communication, knowing that the information was obtained through an interception, shall be guilty of a misdemeanor punishable by imprisonment in a jail or a house of correction for not more than two years or by a fine of not more than five thousand dollars."

84.     The Massachusetts Supreme Judicial Court declared that it was the intent of the legislature to "strictly" prohibit all secret audio recordings when made without the knowledge or permission of all parties. *Commonwealth v. Hyde*, 434 Mass. 594, 595 (Mass. 2011).

85.     The "civil remedy" provisions of G.L. c. 272, § 99 provide the party subject to a secret recording without his or her knowledge or permission with a cause of action for statutory and punitive damages, an invasion of privacy claim, court costs, and attorney fees.  Specifically, the statute reads as follows:

> Any aggrieved person whose oral or wire communications were intercepted, disclosed or used except as permitted or authorized by this section or whose personal or property interests or privacy were violated by means of an interception except as permitted or authorized by this section shall have a civil cause of action against any person who so intercepts, discloses or uses such communications or who so violates his personal, property or privacy interest, and shall be entitled to recover from any such person: (1) actual damages but not less than liquidated damages computed at the rate of $100 per day

for each day of violation or $1000, whichever is higher; (2) punitive damages; and (3) a reasonable attorney's fee and other litigation disbursements reasonably incurred.

G.L. c. 272, § 99 Q.

86.     Defendants directly, through their agent Telemarketers, willfully, knowingly and intentionally violated the MWTA by secretly recording Plaintiff without his prior knowledge or consent and utilizing these recordings for their own purposes.

87.     Plaintiff is entitled to statutory damages under the MWTA of $100 per day or not less than $1,000, whichever is higher and entitled to punitive damages under the provisions of the MWTA, his attorney fees, and costs.

## <u>COUNT V</u>
### Invasion of Privacy by Intrusion Upon Seclusion

88.     The allegations of paragraphs one (1) through eighty-seven (87) of this Complaint are realleged and incorporated by reference.

89.     The Massachusetts Privacy Act, M.G.L. c. 214, § 1B, provides, in relevant part, "a person shall have a right against unreasonable, substantial or serious interference with his privacy."

90.     A plaintiff may support a claim of invasion of privacy by showing that a defendant has intruded unreasonably upon the plaintiff's solitude or seclusion.

91.     Defendants directly, and through their agent Telemarketers, knowingly, willfully, intentionally, maliciously and without regard for the rights of Plaintiff, intruded upon Plaintiff's right to privacy by continually harassing Plaintiff with repeated calls as set forth above.

92.     The Unsolicited calls to Plaintiff were so intrusive as to be considered "hounding the plaintiff" and "a substantial burden to his existence," thus satisfying the Restatement of Torts, Second, § 652(b) requirement for an invasion of privacy.

93.     Defendants' conduct and the conduct of their agent Telemarketers resulted in multiple invasions of Plaintiff's privacy in such a manner as would be considered highly offensive to a reasonable person.

94.     As a direct and proximate result of the invasion of privacy of Plaintiff by Defendants and its agent Telemarketers, Plaintiff has suffered the harm set forth in paragraphs forty-six (46) and forty-seven (47) above and other like and serious harm in an amount to be established at trial.

95.     All of the acts of complained of were committed with malice, intent, wantonness and recklessness, and as such, Defendant is subject to punitive damages.

### COUNT VI
**Violations of the Massachusetts Consumer Protection Act, G.L. c. 93A
And Request for Injunctive Relief**

96.     The allegations of paragraphs one (1) through one hundred ninety-five (95) of this Complaint are realleged and incorporated by reference.

97.     At all times relevant, Defendant was engaged in trade or commerce within the meaning of M.G.L. c. 93A §2.

98.     940 C.M.R. § 3.16(4) provides that an act or practice violates M.G.L. c. 93A, §2 "if it violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other federal consumer protection statutes within the purview of M.G.L. c. 93A, s. 2".

99.     The TCPA was promulgated for the protection of consumers.

100.    940 C.M.R. §3.16(3) provides that an act or practice violates M.G.L. c. 93A, §2 "if it fails to comply with existing statutes, rules, regulations, or laws, meant for the protection of the public's health, safety or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide consumers of this Commonwealth protection."

101.    The MTSA was promulgated by the Commonwealth for the protection of the consumers of the Commonwealth, including Plaintiff.

102.    Defendants' and their agent Telemarketers' numerous violations of the TCPA and MTSA (and the regulations promulgated thereunder) constitute unfair and deceptive conduct in violation of M.G.L. c. 93A, § 2.

103.    Defendants engaged in unfair and deceptive conduct, by knowingly and willfully employing Telemarketers who Defendants either knew or should have known utilized illegal practices and methods, in order to attempt to solicit Massachusetts consumers in violation of the TCPA and MTSA.

104.    Defendants who chose to do business in Massachusetts, knew or should have known of the requirements and prohibitions of the TCPA and MTSA (and their underlying regulations) and the applicable provisions of the Massachusetts Privacy Act and Massachusetts common law. Accordingly, Defendants' violations of M.G.L. c. 93A, § 2 were willful and knowing.

105.    Defendants and their agent Telemarketers further engaged in unfair and deceptive conduct by repeatedly violating Plaintiff's right to privacy, recording conversations with Plaintiff without his knowledge or consent and attempting to "slam" Plaintiff in violation of M.G.L. c. 164, § 1F(8)(a); 220 CMR 11.05(4)(c).

106.    As a direct and proximate result of the aforementioned violations of M.G.L. c. 93A Plaintiff has suffered the harm set forth in paragraphs forty-six (46) and forty-seven (47) above and other like and serious harm in an amount to be established at trial.

107.    Plaintiff sent Defendants demand letters, pursuant to M.G.L.c. 93A, § 9(3), to which Defendants failed to timely respond with a reasonable offer of relief.

108.    Plaintiff states upon information and belief that as of the filing of this Complaint,

Defendants' unlawful conduct in violation of the TCPA, MTSA, M.G.L. c. 164 and Chapter 93A

is continuing.  Said conduct, including the unsolicited, harassing and unlawful calls, as alleged

herein, will continue, and will inflict further damage on Plaintiff and Massachusetts consumers,

unless and until this Court, or another court of competent jurisdiction, issues an order directing

Defendant to cease and desist from said conduct.

109.    Accordingly, while monetary damages may be sufficient to compensate Plaintiff and for

past violations, injunctive relief is necessary in order to stop Defendant's unlawful course of

conduct from continuing.

    **WHEREFORE**, as to all Counts, Plaintiff requests that this Court:

1.    Enter judgment for Plaintiff and against Defendants;

2.    Award Plaintiff his actual, compensatory, punitive and special damages to be determined

at trial in an amount exceeding $100,000.00;

3.    Find Defendants to be vicariously liable for the actions and omissions of their agent

Telemarketers complained of herein;

4.    Find that Defendants and their agent Telemarketers violated the TCPA, and award

Plaintiff statutory damages of not less than $500 for each violation;

5.    Find that Defendants' violations of the TCPA were willful, and award Plaintiff statutory

damages of not less than $1,500 for each violation;

6.    Find that Defendants and their agent Telemarketers violated the MTSA, and award

Plaintiff statutory damages of not less than $5,000.00 for each violation;

7.      Find that Defendants and their agent Telemarketers' actions complained of were willful, knowing, intentional, unfair, and deceptive, in violation of M.G.L. c. 93A and award Plaintiff actual, statutory and/or multiple damages;

8.      Award Plaintiff his reasonable costs, expert fees, attorney fees and expenses;

9.      Issue a **permanent injunction**, enjoining Defendants from additional and continuing violations of the TCPA, MTSA, M.G.L. c. 164 and Chapter 93A;

10.     Order disgorgement of all Defendants' ill-gotten profits; and

11.     Award Plaintiff pre-judgment interest and such other and further relief as Plaintiff may be entitled at law or in equity.

**PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY OF ALL CLAIMS SO TRIABLE.**

Dated: April 1, 2022

ROBERT A. DOANE
By his attorney

/s/ RICHARD B. REILING
RICHARD B. REILING, ESQ.
BBO # 629203
**BOTTONE | REILING**
63 Atlantic Ave., 3rd Floor
Boston, MA 02110
Phone:      (617) 412-4291
Facsimile:  (617) 412-4406
Email:  richard@bottonereiling.com

And

DAVID PASTOR, ESQ.
BBO # 391300
**PASTOR LAW OFFICE, LLP**
63 Atlantic Avenue, 3rd Floor
Boston, MA 02110
Telephone:  (617) 742-9700
Facsimile:  (617) 742-9701
Email:  dpastor@pastorlawoffice.com